UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. RODNEY C. HEATH and QUINN R. HEATH, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:15-cv-00425-JMS-MJD |
| vs. | ) ) | |
| INDIANAPOLIS FIRE DEPARTMENT, | ) ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Rodney Heath ("Rodney") is a backup fire investigator with the Defendant Indianapolis Fire Department ("IFD"). Rodney has filed a *qui tam* action pursuant to the False Claims Act ("FCA"), alleging that IFD submitted to the Federal Emergency Management Agency ("FEMA") false statements in connection with a grant application and related payment requests. Rodney's son Quinn Heath ("Quinn") alleges that after Rodney filed this action, IFD retaliated against Quinn by failing to hire him as a firefighter with the Department. Presently pending before the Court is IFD's Motion for Summary Judgment. [Filing No. 78.] For the reasons that follow, the Court denies IFD's Motion as to Rodney's claims and grants IFD's Motion as to Quinn's claim.

## I.
### LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the

asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary

judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

On January 18, 2013, IFD submitted a grant application to FEMA for a Fire Prevention and Safety Grant (the "FP&S Grant"). [Filing No. 78-2.] The application requested funding to expand the territory of IFD's fire investigation unit (the "arson unit") to the south side of Indianapolis. [Filing No. 78-2 at 3-4.] The application specifically requested funding for four fire investigators and one IT Specialist, with each position to be paid a lieutenant-grade salary of $70,838 and a fringe benefits package of $28,523. [Filing No. 78-2 at 10-11.] The IT Specialist's job duties were designated in the grant application as assisting with "data collection, management, and analysis." [Filing No. 78-2 at 9.]

On April 5, 2013, FEMA staff recommended awarding the grant to IFD. [Filing No. 78-3 at 1.] On May 16, 2013, before the grant was awarded, FEMA grant specialist Francisco Bernal requested that IFD provide the names and salaries of the four investigators and the IT Specialist, as well as the percentages of time that they would each spend on grant-funded activities. [Filing No. 78-4 at 1.] Mr. Bernal requested this information pursuant to the "financial integrity review" that FEMA conducts of each grant application. [Filing No. 78-3 at 2.] IFD Deputy Chief Al Stovall responded by email to that request on May 31, 2013, stating that, as relevant here, Benjamin

Tupper would serve as the IT Specialist, that Mr. Tupper would spend 80% of his time on activities related to the grant, and that his annual salary was $73,113.  [Filing No. 78-4 at 3-4.]  On June 4, 2013, Mr. Bernal replied by email, asking for clarification that "…the amount that should be requested in the grant application [for Mr. Tupper's salary] is $58,490.  Is that correct?"  [Filing No. 84-10 at 1.]  Deputy Chief Stovall responded that Mr. Bernal's clarification was correct.  [Filing No. 84-10 at 1.]  FEMA awarded the FP&S grant on July 19, 2013, with a period of performance to run from July 11, 2013 to July 10, 2014.  [Filing No. 78-3 at 1; Filing No. 78-5 at 3.]

Prior to receiving the grant, beginning sometime in 2011, Mr. Tupper worked in a "special projects" position and reported to Deputy Chief Stovall.  [Filing No. 78-7 at 7; Filing No. 78-8 at 25.]  After the grant was awarded, IFD "reclassified [Mr. Tupper's] position to accommodate the award of the grant in title and responsibility."  [Filing No. 78-8 at 25.]  Deputy Chief Stovall instructed Mr. Tupper to spend 80% of his time on grant-related activities.  [Filing No. 84-14 at 10.]  Mr. Tupper's duties included "gather[ing] the requirements necessary for [IFD] to deliver an application or a series of reports that will allow the arson unit to more efficiently advance their clearance rates, increase their effectiveness overall…."  [Filing No. 78-8 at 28.]  Mr. Tupper's duties did not include providing technological support for fire investigators in the south side fire investigation unit, where he had been employed prior to his special projects role.  [Filing No. 84-14 at 9.]  His office remained in the City-County Building, and he did not relocate to the building where the south side fire investigation unit was located.  [Filing No. 78-8 at 17; Filing No. 78-8 at 30.]

Mr. Tupper left the IT Specialist position in February 2014 to return to the fire suppression unit.  [Filing No. 84-15 at 24-25.]  During the approximately six months that Mr. Tupper worked

as an IT Specialist, he attended several meetings with members of the fire investigation unit. [Filing No. 78-8 at 27.] Mr. Tupper also had a standing weekly meeting with Deputy Chief Stovall to update him on their projects. [Filing No. 78-8 at 30.] He also met with members of the Indianapolis Metropolitan Police Department's bomb unit to identify any tools already in use that could "fulfill the requirements of the grant." [Filing No. 78-7 at 15-16.] Mr. Tupper was tasked with creating a "Gantt Chart" of project components by the end of the grant year. [Filing No. 84-15 at 22-23.] He was also tasked with "defining the deliverables" of the grant. [Filing No. 84-15 at 25-26.] Mr. Tupper did not complete either of those projects before his departure six months into the grant. [Filing No. 84-15 at 23-26.]

Deputy Chief Stovall did not fill the vacant IT Specialist position after Mr. Tupper departed, [Filing No. 78-8 at 43-44], and IFD did not notify FEMA that the IT Specialist position had been vacated, [Filing No. 78-3 at 3]. IFD eventually sought and received an amendment to the grant, extending its period of performance through December 31, 2014. [Filing No. 78-10 at 1.] On May 30, 2014, IFD submitted a reimbursement request to FEMA, which included $34,816.37 for the IT Specialist's costs. [Filing No. 78-9 at 1-4.] On December 8, 2015, IFD submitted a final grant closeout report to FEMA that indicated a charge of $34,816.37 to the FP&S grant award for the IT Specialist's costs. [Filing No. 78-9 at 20.] Of that amount, FEMA reimbursed $18,593.03 and IFD paid $16,223.34 in cost-matching. [Filing No. 78-9 at 3-4.]

Plaintiff Rodney Heath (or the relator, in FCA terminology) is a backup investigator in the arson unit. [Filing No. 78-12 at 8.] In January 2015, Quinn Heath, Rodney's son, passed IFD's written examination to become a firefighter. [Filing No. 58 at 5.] On March 8, 2015 he passed an oral interview with IFD. [Filing No. 58 at 6.] In April 2015, he passed the Certified Physical

Agility Test.  [Filing No. 58 at 6.]  On March 13, 2015, while Quinn was completing the application process with IFD, Rodney filed the *qui tam* action in this Court.  [Filing No. 1.]

After completing his required testing, Quinn was ranked 82nd among all applicants in his application cycle.  [Filing No. 78-13 at 50.]  IFD utilizes an 80/20 policy, under which the Fire Chief is required to fill the first 80% of an entering class's slots with candidates chosen in rank order, and he may choose the remaining 20% from anyone remaining on the eligibility list.  [Filing No. 84-19 at 8-9.]  30 applicants were selected for the academy class scheduled to begin on August 3, 2015.  [Filing No. 84-19 at 14-15.]  Fire Chief Ernest Malone selected the top-ranked 24 applicants to meet the 80% rule, and he selected the remaining 20% based on his discretion.  [Filing No. 84-19 at 10.]  In May 2015, Quinn learned that he was not selected for this class.  [Filing No. 84-20 at 2-3.]

On September 16, 2015, Quinn was informed that he had not been selected for the second recruit class scheduled to begin February 2016.  [Filing No. 84-12 at 1-2.]  For that class, Chief Malone selected 39 applicants.  [Filing No. 84-19 at 15.]  He selected 27 applicants based on rank and 12 applicants based on discretion.  [Filing No. 84-19 at 13.]

Also on September 16, 2015, Deputy Chief Fred Pervine informed Lieutenant Mario Garza and others that they were scheduled to be interviewed by federal investigators regarding the FP&S Grant.  [Filing No. 84-13.]  When Lieutenant Garza asked Deputy Chief Pervine why these individuals were being interviewed, Deputy Chief Pervine responded that Rodney had made a complaint to the federal government.  [Filing No. 84-17 at 7-9.]

### III.
### DISCUSSION

The Plaintiffs raise three claims under the False Claims Act, the first two brought by Rodney, and the third brought by Quinn: (1) violation of 31 U.S.C. § 3720(a)(1)(B), alleging that

IFD falsely represented to FEMA that Mr. Tupper would be the IT Specialist and would dedicate 80% of his work time to the FP&S Grant; (2) violation of 31 U.S.C. § 3729(a)(1)(A), alleging that IFD submitted false reimbursement requests when it requested reimbursement for Mr. Tupper's salary; and (3) violation of 31 U.S.C. § 3730(h), alleging that IFD unlawfully retaliated against Quinn because of Rodney's *qui tam* action.

The FCA "permits private citizens, called relators, to prosecute *qui tam* suits against alleged fraudsters on behalf of the United States government." *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 998 (7th Cir. 2014). The United States may opt to intervene in a *qui tam* suit, 31 U.S.C. § 3730(b)(2), but where it declines to do so—as it has here, [Filing No. 31]—the relator may continue pursuing the lawsuit. *United States ex rel. Watson v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013); 31 U.S.C. § 3730(c)(3).

### A. Violations of 31 U.S.C. § 3729(a)(1)(A), (B)

To state a claim under the FCA, a plaintiff must show that: (1) the defendant made a statement in order to receive money from the government; (2) the statement was false; (3) the defendant knew that the statement was false; and (4) the false statement was material to the government's decision to pay or approve the false claim. *U.S. ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 561 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 2510, 195 L. Ed. 2d 840 (2016); *see also* 31 U.S.C. § 3729(a)(1)(A) (imposing liability for one who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval") and 31 U.S.C. § 3729(a)(1)(B) (imposing liability for one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim").

The crux of Rodney's claims is that IFD made a false statement to FEMA when it claimed that Mr. Tupper would devote 80% of his time to grant-related projects, and it made another false

statement when it submitted payment requests for Mr. Tupper's salary. The parties do not dispute that IFD made a statement in order to receive money from the government. IFD argues, however, that Rodney cannot establish that the statements at issue were false, that IFD knew the statements were false, or that the allegedly false statements were material to the government's decision to approve the grant or make a payment pursuant to it. The Court addresses each element in turn.

### 1. Falsity of Statements

IFD argues that neither of the statements at issue were false. [Filing No. 79 at 13-14; Filing No. 79 at 18-21.] Rodney contends that Deputy Chief Stovall's representation to Mr. Bernal that Mr. Tupper would be the IT Specialist, and that he would dedicate 80% of his time to grant-related projects was false because (1) Mr. Tupper did not perform the duties of an IT Specialist; (2) he did not spend 80% of his time working on grant-related activities throughout the life of the grant, because he left his position prematurely in February 2014; and (3) a genuine dispute of material fact exists as to whether Mr. Tupper spent 80% of his time on the FP&S Grant, even if the relevant time period is limited to when he was assigned to the IT Specialist role. [Filing No. 95 at 15-19.] And because Mr. Tupper did not dedicate the requisite time to his IT Specialist duties, Rodney argues, the payment request for his salary was false as well. [Filing No. 95 at 23-25.]

IFD responds that Mr. Tupper performed the duties as described in the grant application, and that Rodney's attempt to impose his own definition of "IT Specialist" should be rejected. [Filing No. 86 at 2-4.] IFD also argues that Deputy Chief Stovall directed Mr. Tupper to spend 80% of his time on grant-related activities, so his statement was not false when made. [Filing No. 79 at 15.] And finally, IFD contends that its payment request was not false, because it did not claim reimbursement for Mr. Tupper's salary after he left the IT Specialist position. [Filing No. 79 at 18-21.]

*a. The 80% Statement*

Rodney raises several arguments in support of the contention that the grant application contained a false statement.

First, Rodney argues that Mr. Tupper was designated as the IT Specialist, but "he did not regularly perform the duties that one would expect an IT Specialist to perform, such as technology support or other computer help for the fire investigators on the south side unit." [Filing No. 95 at 15.] Rodney argues that the "title of IT Specialist generally connotes a specific type of skill set, such as IT or computer science training, education, or certifications, and specific types of duties, such as tech support and maintenance of IT systems." [Filing No. 95 at 16.] This argument is unpersuasive, however, for several reasons. First, the grant application specifically defines what duties the IT Specialist was designated to perform: "assist[ing] with data collection, management, and analysis." [Filing No. 78-2 at 9.] If these duties were not within the scope that the grant encompassed, FEMA could have so stated. It did not, so the Court can only conclude that the parties reached a mutual understanding as to what duties the IT Specialist would properly perform. Second, Rodney provides no explanation as to why this Court should conclude that his proposed definition of "IT Specialist" should trump the contractual language drafted by IFD and accepted by FEMA. Given that agreement, Rodney's argument reduces to merely a dispute regarding what title Mr. Tupper should have been given. That dispute does not demonstrate falsity.

Rodney also objects to this job description as being "so vague and generic that it could possibly apply to a wide range of personnel in the IFD." [Filing No. 95 at 16.] But the position description's vagueness is irrelevant, given that FEMA approved funding for the position as written.

Next Rodney argues that IFD's statement that Mr. Tupper would be the IT Specialist and that he would spend 80% of his time on grant-related duties was false, because Mr. Tupper left the IT Specialist position after approximately six months. [Filing No. 95 at 17.] The problem with this argument is that Rodney does not allege or provide evidence that Deputy Chief Stovall knew that Mr. Tupper would leave prematurely at the time that he made the statement. Indeed, IFD submits Deputy Chief Stovall's testimony that he did not know at the time of the grant application submission that Mr. Tupper would leave. In order to show that Deputy Chief Stovall's statement was false, Rodney must show that it was false *at the time it was made. U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1105 (7th Cir. 2014) ("The problem with this part of [the Plaintiff's] complaint lies elsewhere: in an insufficient showing that the "I agree" statement was false when the pharmacy made it. It may have been an honest statement of intentions at the time, followed by a change of heart, motivated perhaps by greed, that caused the pharmacy to renege—and in that case the pharmacy would not have made any false statements, but simply have billed Medicare when it shouldn't have.") Rodney counters that "[Deputy Chief] Stovall did nothing to notify FEMA about the change after [Mr.] Tupper left." [Filing No. 95 at 17.] However, even if Deputy Chief Stovall were required to make such a notification, any failure to do so would not retroactively render his prior statement false.

Finally, Rodney argues that there are genuine disputes of material fact as to whether Mr. Tupper actually devoted 80% of his time to grant-related activities while in the IT Specialist position, and as to whether Deputy Chief Stovall ever intended for Mr. Tupper to do so. [Filing No. 95 at 17.] The Court agrees with Rodney that a genuine dispute of material fact exists as to whether Mr. Tupper spent 80% of his time on grant-related activities. In the cited portions of deposition testimony, Mr. Tupper could only identify a handful of meetings and at most twelve

phone calls (some occurring before Mr. Tupper moved into the IT Specialist role) as representative of his work specifically relating to the FEMA grant. [*See* Filing No. 78-7 at 12-16.] Mr. Tupper also testified that he did not assist in any data collection or analysis relative to many of the objectives listed in the grant, such as enhancing clearance rate capacity through improved data collection, data reporting, and evaluation of arrival times. [Filing No. 78-7 at 25.] When asked whether he could identify "any project task, assignment, deliverable that [he] completed while [he was] in the special projects role that was specific to the arson unit," Mr. Tupper responded that he could not. [Filing No. 84-15 at 29.] Deputy Chief Stovall also testified that he was not able to locate any notes, emails, or documents related to any work that Mr. Tupper did regarding the development of the reporting tool that the grant was aimed at creating. [Filing No. 84-14 at 8.] This evidence is sufficient to demonstrate a genuine dispute of material fact regarding whether Mr. Tupper devoted 80% of his time to grant-related activities, as indicated in the grant application.

However, as previously discussed, in order to establish that the 80% statement was false, Rodney must show that the statement was false *when made*—not simply that the subject promise failed to materialize. Rodney has not identified any direct evidence contemporaneous with the statement at issue that would support the conclusion that the statement was false. Rodney has, however, pointed to circumstantial evidence that could support the conclusion that Deputy Chief Stovall never intended for Mr. Tupper to devote 80% of his time to grant-related activities, and therefore that the statement was false when made. Rodney cites, for example, that Mr. Tupper was able to identify few grant-related tasks and activities that he worked on. Rodney also points out that Deputy Chief Stovall tasked Mr. Tupper with several deliverables related to the grant, including "find[ing] out what the requirements were for the tool that [they] needed to develop for the arson unit," [Filing No. 84-14 at 8], creating a "Gantt chart" of project components, [Filing

No. 84-15 at 22-23], and "defining the deliverables" of the grant, [Filing No. 84-15 at 25-26].  Mr. Tupper did not complete any of those projects, and Deputy Chief Stovall was aware that they were not completed.

Rodney also points out that Deputy Chief Stovall could provide no documentary evidence of any work Mr. Tupper did on the development of the targeted reporting tool.  Deputy Chief Stovall also testified that he did not track or require Mr. Tupper to track the amount of time he devoted to grant activities, even after being prompted to do so by the Financial Grants Manager and a representative from the payroll department.  [Filing No. 84-14 at 12.]  Rodney essentially contends, pointing to these facts, that a reasonable supervisor in Deputy Chief Stovall's position would have known that Mr. Tupper could not have been spending 80% of his time on grant-related activities, because he had nothing to show for his efforts.  Therefore, Rodney argues, it is reasonable to conclude that Deputy Chief Stovall never intended for Mr. Tupper to devote the requisite time to grant projects.

The Court reiterates that on summary judgment, it is required to view the facts in the light most favorable to Rodney, as the non-moving party.  It is not the Court's role to weigh competing evidence, and the Court makes no determination as to the likelihood of Rodney's success at trial. Under this standard, the Court concludes that Rodney has provided sufficient evidence to establish a genuine dispute of material fact regarding the alleged falsity of IFD's statement that Mr. Tupper would devote 80% of his time to grant-related activities.

### b. The Requests for Reimbursement

IFD argues that none of its requests for reimbursement contained false statements.  It contends that it only claimed reimbursement for Mr. Tupper's salary for the time that he actually worked on the grant, and that IFD did not request reimbursement for any portion of Mr. Tupper's

salary after 2013. [Filing No. 79 at 19-20.] Rodney responds that even if Mr. Tupper did devote 80% of his time to grant-related work, IFD still overcharged FEMA for that portion of Mr. Tupper's salary.[1] [Filing No. 95 at 24.]

IFD's grant application lists the salary of the IT Specialist as $70,838. [Filing No. 78-2 at 6.] In his email exchange with Mr. Bernal, before the grant was awarded, Deputy Chief Stovall indicated that Mr. Tupper would serve as the IT Specialist, that his salary was $73,113, and that Mr. Tupper would devote 80% of his time to grant activities. [Filing No. 78-4 at 3-4.] Mr. Bernal then clarified that the amount that should actually be requested "in the grant application is $58,490," which Deputy Chief Stovall confirmed. [Filing No. 84-10 at 1.] The grant award, however, lists the amount awarded for the IT Specialist as follows: "For Personnel the IT Specialist has been reduced from $70,838 to $58,490 due the [sic] IT Specialist will be dedicating 80% of his time to this project." [Filing No. 78-5 at 4.] The grant award appears to list the wrong starting salary—it lists the original grant application amount of $70,838, as opposed to Mr. Tupper's actual salary of $73,113. But it lists the correct 80% grant award figure, as calculated by Mr. Bernal based on Mr. Tupper's actual salary: $58,490 is 80% of $73,113, not $70,838.[2]

IFD requested reimbursement for Mr. Tupper's services in the amount of $34,816.37. [Filing No. 78-9 at 1-4.] IFD alleges that it only requested reimbursement for Mr. Tupper's salary

---

[1] Rodney also argues that IFD's reimbursement request was false because IFD was only authorized to claim reimbursement for the percentage of time that Mr. Tupper actually devoted to grant-related work, and that percentage (as described above) was less than 80%. [Filing No. 95 at 24.] The Court need not address this argument, because it concludes that a genuine dispute of material fact exists as to the amount of reimbursement, even assuming that Mr. Tupper devoted 80% of his time to grant work.

[2] The Court highlights this discrepancy for the sake of clarity and because it appears to have been overlooked by the parties, given that IFD references the $70,838 figure as the starting point for the salary analysis.

during the months he worked on the project in 2013, from July through December. [Filing No. 78-9 at 4.] Assuming that Mr. Tupper fulfilled his 80% obligation, Rodney argues, IFD should only have claimed reimbursement for 80% of Mr. Tupper's salary during the six months he worked as the IT Specialist. His $73,113 salary prorated to six months amounts to $36,556.50. 80% of that amount is $29,245.20, not the $34,816.37 requested by IFD, representing a difference of $5,571.17.

IFD does not respond directly to Rodney's argument regarding the apparent discrepancy, and it does not explain or cite any evidence as to how it determined the amount it would submit for reimbursement. Under these circumstances, the Court concludes that genuine issues of material fact exist as to whether IFD's reimbursement request contained a false statement.

### 2. Knowledge of Falsity

To be liable under the FCA, IFD "must have acted with actual knowledge, or with deliberate ignorance or reckless disregard to the possibility" that its representations were false. *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 1000 (7th Cir. 2014) (internal citations and quotations omitted). Rodney argues that IFD made both of the statements at issue with knowledge of their falsity.

### a. The 80% Statement

Regarding Deputy Chief Stovall's statement to Mr. Bernal that Mr. Tupper would spend 80% of his time on grant-related activities, IFD argues that even if that were a false representation, Deputy Chief Stovall did not make it knowingly. [Filing No. 79 at 15.] IFD contends that Deputy Chief Stovall did not know that Mr. Tupper would vacate the IT Specialist position midway through the grant period. [Filing No. 79 at 16.] Rodney responds that, even assuming that Deputy Chief Stovall did not know that Mr. Tupper would leave the IT Specialist position during the grant

period, the evidence supports the conclusion that Deputy Chief Stovall never intended for Mr. Tupper to devote 80% of his time to grant-related work while he was there.[3] [Filing No. 95 at 20.]

For the same reasons described by the Court in evaluating the alleged falsity of the 80% statement, the Court concludes that a genuine dispute of material fact exists as to whether Deputy Chief Stovall knew of its falsity. The parties dispute whether Deputy Chief Stovall ever intended for Mr. Tupper to devote 80% of his time to grant-related activities, and if he did not, then a reasonable jury could conclude that Deputy Chief Stovall knowingly made a false statement. As described above, evidence supporting the conclusion that Deputy Chief Stovall did not intend for Mr. Tupper to devote 80% of his time to grant activities include: that Mr. Tupper was able to identify few grant-related tasks and activities that he worked on; that Deputy Chief Stovall tasked Mr. Tupper with several deliverables related to the grant, and none were completed; that Deputy Chief Stovall could provide no documentary evidence of work Mr. Tupper did on the development of the targeted reporting tool; and that Deputy Chief Stovall did not track or require Mr. Tupper to track whether Mr. Tupper was dedicating 80% of his time to grant activities, even after prompting to do so by the Financial Grants Manager and a representative from the payroll department. This showing is sufficient to survive summary judgment on this element.

---

[3] Rodney also argues that a knowing misrepresentation is clear because IFD failed to employ an IT Specialist at all (based on Mr. Tupper not being assigned "traditional" tech support functions). [Filing No. 95 at 19.] As described above, this argument is unpersuasive, and the Court need not address it again here. Likewise, Rodney contends that Deputy Chief Stovall was "deliberately ignorant or in reckless disregard of the time [Mr.] Tupper actually spent on the FP&S Grant." [Filing No. 95 at 19.] As discussed above, Rodney must show that the statement was false *when made*—not simply that the subject promise failed to materialize. So Deputy Chief Stovall's failure to monitor Mr. Tupper, or to ensure that he actually devoted 80% of his time to the grant, is relevant only to the extent that it provides evidence of Deputy Chief Stovall's intent at the time the statement was made.

*b. The Request for Reimbursement*

IFD argues that, assuming there were any false statements in its reimbursement request, Rodney cannot establish a genuine dispute of material fact regarding whether they were knowingly submitted for two reasons: (1) "none of the requests identified specific expenses that could be construed as representations that specific goods or services were purchased or provided by IFD in the timeframe covered by the request[;]" and (2) "the Plaintiffs did not depose any IFD personnel involved with drafting or submitting the requests, which means he has no evidence of IFD's knowledge at the time the requests were submitted." [Filing No. 79 at 22.] Rodney responds that IFD's choice not to identify specific expenses in its reimbursement request does not preclude him from being able to prove that IFD claimed reimbursement for services not rendered. [Filing No. 95 at 27.] Rodney also argues that he is under no obligation to provide deposition testimony in order to support his claim at the summary judgment stage. [Filing No. 95 at 27.] In reply, IFD argues that Rodney must identify the specific individual alleged to have known that the statement was false, and that the knowledge of falsity cannot be attributed to IFD as a whole. [Filing No. 86 at 7.] IFD argues that Rodney has not specifically identified such a person, and therefore his claim must fail.[4] [Filing No. 86 at 7.]

The Court concludes that Rodney has submitted sufficient evidence to survive summary judgment as to whether any false reimbursement requests were knowingly submitted. First, the

---

[4] IFD raises this argument for the first time in its reply brief, and arguments raised for the first time in reply are deemed waived. *United States v. Dabney*, 498 F.3d 455, 460 (7th Cir. 2007). In the relevant section of IFD's brief in support of summary judgment, IFD itself consistently refers to the "knowledge of the IFD," and nowhere mentions an individual knowledge requirement. [*See, e.g.*, Filing No. 79 at 22.] The Court also notes that IFD cites only to out-of-circuit case law in support of its contention that Rodney must identify an individual with the requisite knowledge. Such citations are not binding on this Court, and because the argument was raised first in reply, the Court will not consider it further.

Court rejects IFD's argument that because IFD did not itemize its specific reimbursement requests, Rodney cannot prove that a false statement was knowingly made. If the Court understands IFD's argument, IFD contends that because it did not specifically state which portion of the reimbursement request covered Mr. Tupper's salary, it was not making a representation to FEMA as to that specific reimbursement. But the grant specified that "IFD was only permitted to charge all or a portion of Benjamin Tupper's salary to the FP&S award for the purpose of performing the type of work identified in the terms and conditions of the FP&S award." [Filing No. 78-6 at 3.] Whether IFD requested this salary reimbursement on its own or aggregated it with other expenses says nothing about the propriety of the request: the grant terms still dictate what expenses are properly reimbursable.

Second, IFD cannot maintain that because it did not itemize the reimbursements, it did not know the amount being claimed for Mr. Tupper's salary. IFD specifically identified, and thus had knowledge of, which reimbursement requests covered Mr. Tupper's salary. Ms. Sykes' affidavit states that $34,816.37 of Mr. Tupper's 2013 salary was tagged for reimbursement, and that these funds were "covered by the request for reimbursement [she] submitted on May 30, 2014." [Filing No. 78-9 at 3-4.] So regardless of whether IFD chose to itemize its reimbursement request, it specifically identifies what portion of the reimbursement request reflects Mr. Tupper's salary. The Court notes that were it to accept IFD's argument on this point, an entity could knowingly submit false reimbursement requests and evade liability simply by submitting those requests as lump sums. The Court cannot conclude that the statute contemplates such a result.

As to IFD's second argument, that the Plaintiffs did not depose any IFD personnel involved with drafting or submitting the requests, and therefore cannot provide any evidence of knowledge, the Court finds this argument unpersuasive. The affidavit of Ms. Sykes, who was involved in the

drafting and submission of the reimbursement requests, provides direct evidence in support of central factual allegations, such as the reimbursement amounts, as described above. This is a sufficient showing at the summary judgment stage.

Rodney has made the required showing at this stage, and the Court concludes that a genuine dispute of material fact exists as to whether any reimbursement requests were knowingly and falsely submitted.

### 3. Materiality

IFD argues that neither of the allegedly false statements were material to FEMA's decisions regarding the award or payment of grant funds. IFD contends that Deputy Chief Stovall's email to Mr. Bernal detailing Mr. Tupper's salary and 80% time commitment cannot have been material to FEMA's decision-making, because FEMA had already decided to award the grant when those representations were made. [Filing No. 79 at 16.] IFD also argues that the requests for reimbursement could not have been material to FEMA's payment decisions, because FEMA reviewed the final closeout report and did not take issue with any of IFD's requested payments. [Filing No. 79 at 23.] Rodney responds that these representations were material, because the affidavit submitted by FEMA's representative confirms that those statements were capable of influencing FEMA's decisions. [Filing No. 95 at 28.]

The Court addresses this argument succinctly, because it agrees with Rodney that the affidavit of Margaret Wilson, FEMA's Section Chief for the Staffing for Adequate Fire and Emergency Response Grants, at the very least establishes a genuine dispute regarding the materiality of the statements at issue. Ms. Wilson attested that:

- "FEMA relied on the accuracy of IFD's material representations in its grant application when deciding whether to award the grant to IFD." [Filing No. 78-3 at 2.]

- "If FEMA had been aware that IFD used FP&S funds to pay for a portion of an IFD employee's salary for the purpose of performing the duties of an IT Specialist as described in the FP&S grant award, and that employee was not actually performing those duties, or not performing those duties at least at the rate IFD charged to the FP&S grant award, this would have influenced, or been capable of influencing, FEMA's decision to award the grant or to pay money to IFD under the grant." [Filing No. 78-3 at 2-3.]

The Court concludes that a genuine dispute of fact exists regarding the materiality of the allegedly false statements.

For the reasons described above, the Court concludes that genuine disputes of material fact exist regarding the three required elements of Rodney's claims. Therefore, the Court denies IFD's Motion for Summary Judgment as to Rodney's claims under § 3720(a)(1)(B) and § 3720(a)(1)(A).

### B. Retaliation Claim

IFD also moves for summary judgment on Quinn Heath's claim that IFD failed to hire him in retaliation for his father having filed this *qui tam* action. IFD argues that Quinn lacks standing to bring a claim under 31 U.S.C. § 3730(h), because he has never been an "employee" of IFD, and therefore he is not covered by the statute's protections. [Filing No. 79 at 24.] Quinn acknowledges that the Seventh Circuit has not specifically addressed whether a job applicant may raise a claim as an "employee" under the statute, and he encourages this Court to adopt an interpretation of the statute's terms that includes coverage of applicants. [Filing No. 95 at 29-30.]

The statute provides that:

(1) **In general.**--Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2) **Relief.**--Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the

discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. …

31 U.S.C. § 3730(h).  Beginning with the plain language of Section 3730(h)(1), it provides relief for *employees*, contractors, or agents who are discriminated against due to participating in a *qui tam* action.  The Oxford English Dictionary defines an employee as "a person who works for an employer; *spec.* a person employed for wages or a salary under an employment contract, esp. at non-executive level."  Oxford English Dictionary (5th ed. 1964).  Or, to quote a slightly more legalistic definition, an employee is "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance."  Black's Law Dictionary (10th ed. 2014).  Under either variant, the plain meaning of the term does not include an applicant, who is someone who seeks to become, but is not yet, employed.

In considering the same question, the Sixth Circuit conducted a review of the legislative history of the relevant provision.  That court concluded, and this Court agrees, that the legislative history of the provision does not support expanding the statute's express terms by adding applicants to the list of covered persons.  *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1062-64 (6th Cir. 2014) (concluding the "body of case law and legislative history reinforces our conclusion that the FCA does not extend to non-employee applicants").  Moreover, the available remedies listed by the statute reinforce the conclusion that applicants are not among those contemplated by the statute.  The statute states that the remedy shall include "reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for

any special damages…" 31 U.S.C. § 3730(h)(2).  Quinn is not eligible for reinstatement or back pay, because he was never employed or paid by IFD.

Quinn points to *Haka v. Lincoln County*, 533 F. Supp. 2d 895, 917 (W.D. Wis. 2008), as supporting his position that the statute encompasses applicants.  However, in that case, the plaintiff was a former employee of the defendant and alleged retaliatory discharge and failure to rehire.  The district court in that case addressed only the question of whether the term "employee" encompassed former employees when the complained-of action included an allegedly retaliatory failure to rehire.  Those facts are far removed from the facts of this case, as Quinn was never an employee and was not seeking rehire, and therefore the Court concludes that *Haka* is inapplicable to the instant matter.[5]

For these reasons, the Court concludes that Quinn Heath lacks statutory standing to bring a claim under 31 U.S.C. § 3730(h), and IFD's motion for summary judgment as to that claim is granted.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **DENIES** IFD's Motion for Summary Judgment as to Rodney Heath's claims under 31 U.S.C. § 3720(a)(1)(B) and 31 U.S.C. § 3720(a)(1)(A) and **GRANTS** IFD's Motion for Summary Judgment as to Quinn Heath's claim under 31 U.S.C.

---

[5] Moreover, the Court also notes that while the *Haka* court evaluated this issue under the rubric of whether the term "employee" applied to a former employee seeking to be rehired, the Court is not convinced that this is the proper inquiry.  By its terms, the statute appears to contemplate actions raised by former employees, in that it includes "discharge" as an actionable form of discrimination. The statute does not, however, enumerate failure-to-rehire in the list of prohibited employment actions.  So the more appropriate inquiry in a failure-to-rehire scenario may be whether such an action is encompassed within the statute's catch-all provision, which prohibits the employer from "in any other manner discriminat[ing] against [the employee] in the terms and conditions of employment." 31 U.S.C. § 3730(h)(1).  Because that issue is not before the Court, it need not be addressed.

§ 3730(h). [Filing No. 78.] No partial judgment shall issue at this time, and the Court requests that the Magistrate Judge confer with the parties regarding possible resolution of the remaining claims.

Date: __April 24, 2017__

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Christopher S. Stake
DELANEY & DELANEY LLC
cstake@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Daniel Bowman
FILLENWARTH DENNERLINE GROTH & TOWE LLP
dbowman@fdgtlaborlaw.com

Kathryn M. Box
OFFICE OF CORPORATION COUNSEL
kathryn.box@indy.gov

Richard G. McDermott
OFFICE OF CORPORATION COUNSEL
rmcdermo@indygov.org

Thomas J.O. Moore
OFFICE OF CORPORATION COUNSEL
thomas.moore@indy.gov

Jonathan A. Bont
UNITED STATES ATTORNEY'S OFFICE
jonathan.bont@usdoj.gov